**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ONIONS ETC, INC. and DUDA FARM FRESH FOODS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> Z & S FRESH, INC., *et al*, <br><br> Defendants. | 1:09-CV-00906-OWW-SMS <br><br> MEMORANDUM DECISION RE MOTION TO DETERMINE VALIDITY OF AND OBJECTIONS TO PROOF OF CLAIM (Doc. 259.) |
| AND RELATED CROSS ACTIONS | |

### I. INTRODUCTION

Before the Court for decision is Intervening Plaintiff I.G. Fruit, Inc.'s "Motion To Determine Validity of and Objections to Proofs of Claim." The motion pertains to the $198,467.34 PACA trust claim filed by I.G. on July 13, 2009. Defendant Z & S Fresh, Inc. objected to the claim on July 23, 2009, arguing that I.G. rendered "brokerage services," which are not PACA-protected.[1]

---

[1] Many of Z & S' trade partners (i.e., sellers) filed PACA trust claims based on produce provided by them to Z & S. Defendant

**1**

## II. FACTUAL BACKGROUND

This case arises out of the Perishable Agricultural Commodities Act of 1930 ("PACA"), 7 U.S.C. § 499a *et seq.*, which was enacted to protect sellers of perishable agricultural commodities from unfair conduct by buyers of such commodities, including failure to pay promptly and fully for produce ordered. PACA creates a statutory trust in favor of sellers of produce to buyers (e.g., grocery stores and certain agents), under which the buyer holds the produce and any proceeds and receivables from the produce in trust for the benefit of the seller. 7 U.S.C. § 499e(c)(2).

Defendant Z & S Fresh, Inc. ("Z & S"), a California corporation, is a licensed "dealer" of perishable agricultural commodities within the meaning of PACA. Z & S buys and resells fruits and vegetables. In 2004, Z & S entered into an agreement with Ira Greenstein, doing business as I.G. Fruit, granting I.G. the right to sell fresh fruits and vegetables under the Z & S trade name.[2] (Doc. 398, M. Zaninovich Dec., ¶ 5.) In exchange, I.G. acknowledged that all marketing efforts were done for Z & S' benefit, all fruit/vegetable sales were made through Z & S, and all invoicing and administrative functions were performed by Z & S. (Id. ¶ 8.) Ira Greenstein was also identified as an East Coast sales representative on Z&S' website. (Id. ¶ 11.) However, he

---

Z & S objected to a number of these trust claims. However, the parties resolved nearly all of these objections on December 3, 2009. (See Doc. 381, "Notice of Settlement of Specific Parties.")

[2] I & G Fruit was permitted to use Z & S' trademarks, service markers, and trade dress to represent itself as a sales agent for Z & S. (Id. ¶ 6.)

never held an equity interest in Z & S and never took title or control of any produce.  (Id. ¶ 13.)  According to Z & S, I.G. never acted on behalf of growers or suppliers and the "Agreement specifically required all of Greenstein's efforts and activities to be performed on behalf of Z & S Fresh, Inc."  (Id. ¶ 15.)

Between January 5 and June 1, 2009, I.G. brokered the sale of $198,467.34 worth of perishable agricultural commodities on behalf of Z & S.  For each arranged sale, Z & S delivered the produce to the buyer, who accepted the items on credit and without adjustment. The entire amount remains unpaid.

According to I.G., it preserved its PACA trust interest against Z & S by including the statutorily required language on each invoice.  The invoices provide, in relevant part:

> The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by Section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.

(Doc. 99, pgs. 4 through 143.)

### III. PROCEDURAL BACKGROUND.

On May 22, 2009, two sellers of perishable agricultural commodities, Intervening Plaintiffs Onions Etc., Inc. and Dude Farm Fresh Foods, Inc., commenced this action against Defendant Z & S to recover money owed to them for the sale of produce to Z & S. Also named as Defendants were the officers of Z & S: Martin J. Zaninovich, Loren Schoenburg, and Margaret Schoenburg.  Intervening

3

Plaintiffs claim that 7 U.S.C. § 499e(c)(2) created a trust for their benefit over the proceeds of their produce and that Defendants owed money to Intervening Plaintiffs as beneficiaries of the trust.  Intervening Plaintiffs also alleged that the officers breached their fiduciary duties as trustees of the trust.

On June 3, 2009, the Court entered a temporary restraining order against Defendants and set a preliminary injunction hearing. (Doc. 15.)  On June 24, 2009, the parties agreed to entry of a preliminary injunction, and the Court entered an order setting forth the PACA claims procedure (the "PACA Claims Order"). (Doc. 48.)  The PACA Claims Order established a PACA trust account, appointed Terence J. Long as Trustee of the PACA Trust, and created a PACA claims procedure.  (Id.)  Potential PACA creditors were required to file complaints in intervention and proofs of claim by July 13, 2009.  Objections were to be filed by July 23, 2009 and responses to the objections were due on August 3, 2009.  The parties were allowed to file motions to rule on objections by August 10, 2009.

On July 13, 2009, I.G. Fruit filed a complaint in intervention and proof of claim based on brokerage sales it performed on behalf of Z & S Fresh.  (Docs. 99 & 100.)  Defendant Z & S Fresh, Inc. objected to the claim on July 23, 2009.  (Doc. 168.)  I.G. Fruit filed this motion on August 24, 2009.  (Doc. 259.)

Oral argument on I.G. Fruit's motion was held on December 4, 2009, at which time the parties were requested to submit supplemental briefing on the issue of whether I.G. Fruit qualifies as a PACA trust beneficiary based on the brokerage services it provided to Z&S.  The parties filed supplemental briefing on

4

December 9 and December 11, 2009.   (Docs. 395, 397.)

## IV. DISCUSSION

The motion presents a question of law unique to the Perishable Agricultural Commodity Act:  Was it Congress' intent to provide PACA trust protections to brokers of PACA sellers, to protect their rights to the same extent as the clearly preferred PACA claimant - the grower/supplier?

I.G. advances three arguments to support its position that "sell-side brokers" are beneficiaries under PACA.  First, I.G. argues that the terms "broker" and "agent" are interchangeable under § 499e(c)(2), therefore brokers have the same PACA rights as agents.  Second, I.G. asserts that § 499e(c)(2)'s words "in connection with" include broker fees for selling produce held by the original buyer, here Z & S.  Specifically, I.G. contends that the "in connection with" language includes not only the price of produce sold to the original purchaser, but also additional related expenses, including broker fees connected to the secondary or "to market" transaction.   Third, I.G. contends that *Eastside Food Plaza, Inc. v. "R" Best Produce, Inc*., No. 03-CV-106-SAS, 2003 WL 21727788 (S.D.N.Y July 23, 2003), controls the facts of this case.

### A.   "Agents" and "Brokers" Under PACA

I.G.'s first argument is based on its contention that "brokers" and "agents" are synonymous under PACA.  According to I.G., because the statute fails to distinguish the two terms - or one incorporates the other, brokers have the same PACA rights as agents.  I.G. explains:

5

> **Clearly the protection of agents is part of the express purpose of [PACA]. A 'broker' has been defined in Black's Law Dictionary, Ninth Edition, as a person employed to make bargains and contracts between other persons in matters of trade, commerce, or navigation. An agent has been defined in the same disctionary as 'one who is authorized to act for an in the place of another.' Endemic to the purchase and sale of perishable agricultural commodities in the United States is the role of brokers. There are no cases in wherein it has been reported that hold brokers are not considered 'agents' within the definition of the statute, nor are there any cases expressly holding that brokers are included in the definition of the term 'agent.' The reason is clear - common sense and plain language reveal that these terms are virtually synonymous.**

(Doc. 343 at 112:2-112:11.)

I.G.'s arguments with respect to the connection between agents and brokers are without merit. Under PACA, these terms do not share a common meaning, nor are they incorporated into one another; they do not have the same PACA rights or responsibilities. *Compare A & J Produce Corp. v. Chang*, 385 F. Supp. 2d 354, 358 (S.D.N.Y. 2005) (PACA 'restricts those subject to liability to 'commission merchant[s], dealer[s] or broker[s]' [....]") *with* 7 U.S.C § 499e(c) ("Trust on commodities and sales proceeds for benefit of unpaid suppliers, sellers, or agents [....]"). The statute itself belies I.G.'s contention, as the term "broker" is specifically defined in 7 U.S.C § 499a(b)(7):

> **The term 'broker' means any person engaged in the business of negotiating sales and purchases of any perishable agricultural commodity in interstate or foreign commerce for or on behalf of the vendor or the purchaser, respectively, except that no person shall be deemed to be a "broker" if such person is an independent agent negotiating sales for and on behalf of the vendor and if the only sales of such commodities negotiated by such person are sales of frozen fruits and vegetables having an invoice value not in excess of $230,000 in any calendar year.**

6

*Id*.

Section 499a(12) delineates the difference between brokers and agents: brokers are involved in the transaction based on their relationship with the produce buyer, not the produce supplier - the preferred PACA-protected claimant. In the ordinary case: grower sells produce on credit to a Buyer.[3] The Buyer then sells the produce on credit to a Supermarket, generating an account receivable from Supermarket. Broker earns a commission by arranging the sale between Buyer and Supermarket. An agent facilitates the original sale from Grower to Buyer.[4] Congress drafted the statute to provide an additional layer of protection to the sellers, suppliers, and agents of the original produce transaction. It did not include brokers within this ambit of protection. *See, e.g.,* 7 U.S.C § 499e(c).

With respect to the PACA trust, 7 U.S.C. § 499e provides that: "The unpaid supplier, seller, or *agent* shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or *broker* within thirty calendar days [....]" *Id*. (emphasis added). Applying I.G.'s analysis to § 499e, if brokers and agents are treated alike, a broker preserves its PACA rights by providing notice to *a broker*? Such an interpretation is nonsensical under the statute's express lnaguage. Moreover, the

---

[3] *See JSG Trading Corp. v. Department of Agriculture*, 235 F.3d 608, 616 (D.C. Cir. 2001) ("Brokers by definition negotiate 'for or on behalf of the vendor or the purchaser.'").

[4] Illustration taken from *Boulder Fruit Exp. & Heger Organic Farm Sales v. Transportation*, 251 F.3d 1268, 1271 (9th Cir. 2001).

7

statute does not define the circumstances under which a broker loses its PACA rights. This is best explained by the non-existence of such rights.

The interpreting regulations further explain the distinction between agents and brokers. 7 C.F.R. § 46.46(a)(2) defines trust "dissipation" as any act resulting in the "diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions." Section 46.46(d)(2) imposes a duty on an *agent* to maintain the principal's rights as a PACA trust beneficiary:

> Agents who sell perishable agricultural commodities on behalf of a principal are required to preserve the principal's rights as a trust beneficiary as set forth in § 46.2(z), (aa) and paragraphs (d), (f), and (g) of this section. Any act or omission which is inconsistent with this responsibility, including failure to give timely notice of intent to preserve trust benefits, is unlawful and in violation of Section 2 of the Act [...]

*Id*.

I.G.'s argument that brokers and agents have the same PACA rights conflicts with the relevant statutes and interpreting regulations. Title 7 U.S.C. §§ 499a and 499c make clear that when a party arranges a produce sale between a purchaser and a grocery outlet, it acts as a broker, not an agent. A broker has an entirely different function from an agent, who acts on behalf of the grower. There is no ambiguity on this point. *See* 7 U.S.C. § 499e(c)(1) ("It is hereby found that a burden on commerce in [produce] is caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made

**payment for [produce] purchased, contracted to be purchased, or otherwise handled by them [....]").** In addition, there are no facts that I.G. acted as an agent *and* a broker in this case. Here, I.G. arranged sales from Z & S - the original purchaser - to several produce outlets (retailers), including Winn Dixie and Nature's Best. There is nothing to indicate that I.G. arranged, facilitated, or played an integral role in the original transaction from grower to Z & S.[5] It was therefore only a broker under PACA. I.G.'s rights to PACA assets, if any, are separate and distinct from those of an agent.

Here, I.G.'s interpretation of the agency/broker relationship runs contrary to the applicable statutes and interpreting regulations, which conclusively demonstrate that "agents" and "brokers" are involved in different aspects of the produce transaction.

### B.   "In Connection With"

I.G. next argues that § 499e(c)(2)'s language "in connection with" includes broker fees for selling produce held by the purchaser, here Z & S. According to I.G., Congress intended that all goods and services incurred "in connection with" the produce sale transaction qualify for PACA trust protection. I.G. suggests

---

[5] At oral argument on December 4, 2009, it was suggested that a "broker" could occupy dual roles in certain produce transactions: (1) as a broker for the merchant; and (2) the broker could sell its own produce to the merchant. Based on the record, I.G. only occupied the first role - as a broker for Z & S. There is nothing in the record to indicate that I.G. maintained a separately-owned supply of produce. There is also no evidence that Z & S ever purchased produce from I.G. Fruit.

9

that because a broker's fees are "'intimately associated' with the transaction, they are covered under PACA's remedies, which necessarily include the primary enforcement tool, the statute's trust provisions." (Doc. 219 at 3:20-3:23.)

Z & S responds that there is no basis for I.G.'s theory because PACA protects only growers/suppliers of produce, not "sell-side brokers" like I.G. Z & S acknowledges that § 499e(c)(2) protects unpaid suppliers, sellers, and/or agents in connection with agricultural commodity transactions, but argues that the protection ends there, i.e., sell-side brokers are not PACA-protected. Z & S further contends that I.G. fails to harmonize the text of § 499e(c)(2) and its legislative history and purpose. According to Z & S, I.G.'s application of § 499e(c)(2) leads to an illogical result: a party who did not take title to or possession of any produce, who acted on behalf of the buyer (not any of the growers, suppliers, or producers), and who did not sell/supply any produce, is protected under PACA to the same extent as growers.

7 U.S.C. § 499e(c) provides a starting point. In 1984, Congress amended PACA to more effectively protect produce sellers. Congress recognized that time constraints inherent in selling produce often required sellers of produce to sell their produce to commission merchants, dealers or brokers before ascertaining the creditworthiness of buyers. Under such circumstances, sellers typically became unsecured creditors of buyers, able to recover from defaulting buyers only after lenders holding security interests in defaulting buyers' assets recover in full. Often, after secured lenders collect on their security interests, no

assets to pay sellers remain.  To guard against such situations, Congress added § 499e(c), which enacted a statutory trust for the benefit of produce growers and their agents:

> Trust on commodities and sales proceeds for benefit of unpaid suppliers, sellers, or agents [...]
>
> It is hereby found that a burden on commerce in perishable agricultural commodities is caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment for perishable agricultural commodities purchased, contracted to be purchased, or otherwise handled by them on behalf of another person, encumber or give lenders a security interest in, such commodities, or on inventories of food or other products derived from such commodities, and any receivables or proceeds from the sale of such commodities or products, and that such arrangements are contrary to the public interest.  This subsection is intended to remedy such burden on commerce in perishable agricultural commodities and to protect the public interest.

*Id.* at § 499e(c)-(c)(1).

Section 499e(c)(2) delineates trust eligibility, benefits, and preservation of the res:

> [Produce] received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from [produce], and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.

*Id.*

The substance of I.G.'s arguments is that § 499e(c)(2)'s words "until full payment of the sums owing in connection with such transactions" include broker fees for selling produce held by the purchaser.  However, Courts have universally held that Congress

11

enacted § 499e(c) to give sellers a right to recovery against buyers superior to that of all other creditors, including brokers. *See Middle Mountain Land & Produce v. Sound Commodities*, 307 F.3d 1220, 1224 (9th Cir. 2002) ("[T]he enactment of the PACA amendment elevated the claims of unpaid perishable agricultural commodities suppliers over all other creditors of the bankrupt estate with regard to funds in the PACA trust."); *R Best Produce, Inc. v. Shulman-Rabin Marketing Corp.*, 467 F.3d 238, 242 (2d Cir. 2007) ("[T]he legislative history and the text of the statute as well as the implementing regulations all make clear that [PACA] trust assets are intended exclusively to benefit produce suppliers.") (citation omitted); *Am. Banana Co., Inc. v. Republic Nat. Bank of New York, N.A.*, 362 F.3d 33, 38 (2d Cir. 2001) ("Through these mechanisms [PACA] Congress, in effect, extended a new benefit to produce sellers."). No Court has held that brokers are one of the classes intended to be protected by the PACA Trust.

I.G.'s legal theory incorporates language from *Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701 (2d Cir. 2007), *Country Best v. Christopher Ranch, LLC*, 361 F.3d 629 (11th Cir. 2004), and *Middle Mountain*, 307 F.3d 1220, three cases holding that "where the parties' contracts include a right to attorneys' fees, they can be awarded as 'sums owing in connection with' perishable commodities transactions under PACA." *Coosemans Specialties*, 485 F.3d at 709. *Middle Mountain* is particularly instructive. There, an agricultural supplier filed a proof of claim under PACA for amounts due on unpaid invoices, outstanding attorneys' fees and interest. The supplier argued that it was entitled to fees and interest based on language included in its invoices to the buyer, which created a

12

contractual right to such an award. The district court denied the claim. On appeal, the supplier argued that § 499e(c)(2)'s words "in connection with" encompassed not only the price of the produce but also related attorneys' fees and interest. The Ninth Circuit agreed:

> The plain meaning of the PACA statute's words 'in connection with' encompasses not only the price of the perishable agricultural commodities but also additional related expenses, including contractual rights to attorneys' fees and interest, in a PACA claim. We must give the statutory language its ordinary meaning, and '[w]here Congress has, as here, intentionally and unambiguously drafted a particularly broad definition, it is not our function to undermine that effort.'
>
> Congress wrote the statute broadly to include not only the value of commodities sold but also expenses in connection with the sale of perishable agricultural commodities when it drafted the statute. It did not limit the claim to perishable agricultural commodities alone [...]
>
> A fair reading of the statute brings contractually due attorneys' fees and interest within the scope of the statute's protection of 'full payment owing in connection with the [perishable agricultural commodities] transaction.'

*Id*. at 1223 (citations omitted).

The Court also held that allowing a supplier to file a claim for attorneys' fees and interest was consistent with PACA's legislative history:

> [I]t cannot be contended seriously that interpreting PACA claims to include contractual rights to attorneys' fees and interest under the 'in connection with' language of the statute is contrary to the statute's purpose, absurd, or 'demonstrably at odds with the intentions of the drafters.' There is no evidence that Congress intended to exclude contractual rights to attorneys' fees and interest as outside the scope of a PACA claim. Rather, a congressional committee stated that PACA was intended 'to increase the legal protection for unpaid sellers and suppliers of perishable agricultural commodities until full payment of sums due have been received by them.' The House

13

> Agriculture Committee Report stated that it did not contemplate that PACA would affect 'the ability of the [seller] ... to set contract terms.' It is unlikely that Congress, in enacting a statute to provide better insolvency remedies to perishable agricultural commodities sellers, wanted selectively to exclude legitimate portions of a covered contract from the scope of a PACA claim.
>
> The inequities of including contractual rights to attorneys' fees and interest in a PACA claim is minimal since a PACA claimant can include terms in its contracts with a buyer that allow for collection of expenses arising from a perishable agricultural commodities transaction.

*Id.* at 1224 (citations omitted).

I.G.'s claim for broker fees is distinguishable from the claims advanced in *Coosemans Specialties*, *Country Best*, and *Middle Mountain*. In relying on the language contained in these cases, I.G. overlooks the critical distinction of the claimants's roles in those cases, unlike I.G., were sellers and suppliers who qualified as trust beneficiaries. Specifically, in all three cases, a PACA beneficiary sought to recover legal expenses and interest in addition to its underlying claims for unpaid produce. Here, I.G. is not a PACA trust beneficiary as it is not a "supplier, seller, or agent" and I.G. does not seek to recover administrative expenses in addition to unpaid charges for the produce itself. I.G.'s claim is distinguishable.

In addition, unlike *Middle Mountain*, expanding the PACA trust to "sell-side" brokers is contrary to the statute's purpose and "demonstrably at odds with the intentions of the drafters." There is considerable evidence that Congress intended to give produce sellers a meaningful opportunity to recover full payment of the amounts due for their sales. *See Patterson Frozen Foods, Inc. v.*

14

*Crown Foods Intern., Inc.*, 307 F.3d 666, 669 (7th Cir. 2002) (one of the principal justifications Congress has given for granting such generous protection for sellers of produce is the need to protect small dealers who require prompt payment to survive.).[6] As the broker fees requested by I.G. were incident to a produce sale between a purchaser and a grocery outlet, they are outside the scope of a PACA claim. *See Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc.*, 222 F.3d 132, 138 (3rd Cir. 2000) (PACA's stated purpose is to ensure "payment to the unpaid seller in the perishable agricultural commodities industry.").

Moreover, allowing I.G.'s claim opens the door to other creditors asserting similar claims and subverts Congress's intent to protect sellers as the exclusive beneficiaries of the PACA trust. *Pac. Int'l Marketing, Inc. v. A & B Produce, Inc.,* 462 F.3d 279 (3rd Cir. 2006) is instructive.  There, the Court denied a logistic company's claim for administrative expenses from the PACA trust for its services in transporting produce for Defendant A & B Produce.  It held that the transaction between A & B and the logistics company was not made "in connection with" a covered commodities transaction under PACA.  The Court also discussed how allowing such a claim would directly conflict with both the text of the statute and the purposes underlying it:

> As Pacific correctly notes, if we accepted Exel's characterization of its transportation services as being

---

[6] *See also D.M. Rothman & Co. v. Korea Commercial Bank of N.Y.*, 411 F.3d 90, 93 (2d Cir. 2005) (PACA provides growers and sellers of agricultural produce with "a self-help tool enabling them to protect themselves against the abnormal risk of losses resulting from slow-pay and no-pay practices by buyers or receivers of fruits and vegetables.").

15

> 'in furtherance of its administration of the trust, a multitude of general unsecured creditors [of the buyer of the produce] could step forward and assert administrative expense claims for services performed in the course of produce transactions.' A partial list of these creditors would include 'trucking companies which transport produce, utility companies, which ensure that produce companies have electrical power to refrigerate the produce, paper companies, which provide the paper on which invoices are printed and employees, who sold the [p]roduce and collected the proceeds.' Ultimately characterizing Exel's services as administrative expenses would enable all sorts of the buyer's unpaid creditors to assert priority administration expense claims ahead of the claims of the sellers and other entities that Congress intended to protect as beneficiaries of the PACA trust. The claims of such creditors, including Exel's, are simply too tangential to the claims that Congress intended PACA to protect to permit their payment as PACA administrative expenses.

*Id.* at 285 (citations and quotations omitted).

This language applies with equal force to the facts of this case.

I.G.'s final argument to support its position is that it included the statutorily-required PACA language in its invoices with Z & S. A review of the invoices confirms that I.G.'s invoices contain the required language. (See Doc. 99, pgs. 4 through 143.) That is not dispositive of the inquiry, however. If all that is required for an entity to become a PACA beneficiary is a statement that "all items are sold subject to PACA," then the 1984 amendments are without legal effect. Here, whether a party is a PACA beneficiary depends on the statute and its relationship to other parties in a transaction, not boilerplate language inserted into a contract.[7]

---

[7] There is also no indication that I.G. provided notice of – or bargained for – the PACA language to the intended beneficiaries of the PACA trust, which was critical to the Ninth Circuit's

16

The facts of this case are clear. I.G. did not sell or supply produce to Z & S but instead brokered a number of produce transactions between Z & S and several grocery outlets. The transactions were performed pursuant to a written contract between Z & S and I.G., and did not include PACA-intended beneficiaires, the original growers/suppliers. *Middle Mountain* makes clear that Congress intended to protect growers, sellers and suppliers of produce, not brokers who are ancillary to the original sale of produce between the seller and purchaser. As in *Pac. Int'l*, the provisions and intent of PACA cannot be interpreted to allow I.G. to recover its broker fees prior to the distribution of trust funds to the qualified beneficiaries.

C. *Eastside Food Plaza, Inc. V. "R" Best Produce, Inc.*

I.G. argues that *Eastside Food Plaza, Inc. v. "R" Best Produce, Inc.*, No. 03-CV-106-SAS, 2003 WL 21727788 (S.D.N.Y July 23, 2003) controls the facts of this case. In particular, I.G. relies on *Eastside Food Plaza* for the proposition that "[i]f a broker is eligible under 7 U.S.C. § 499e(b) to recover brokerage commissions, then he is also eligible under the trust statute after complying with the requirements of invoice language and timely service of the invoice to render him eligible." (Doc. 396 at 4:20-4:21.)

The *Eastside Food Plaza* decision is distinguishable. The

---

analysis in *Middle Mountain*. *See* 307 F.3d at 1224 ("The inequities of including contractual rights to attorneys' fees and interest in a PACA claim is minimal since a PACA claimant can include terms in its contracts with a buyer that allow for collection of expenses arising from a perishable agricultural commodities transaction.").

17

issue in Eastside was whether a broker of produce sales has standing to advance an unfair conduct claim under PACA.[8] Defendant argued that Plaintiff lacked standing to bring a PACA claim because "PACA was enacted to protect unpaid sellers and suppliers of produce, and [Plaintiff] is merely an alleged unpaid broker of produce sales."  The Court disagreed, finding that Defendant's approach was "constricting" and inconsistent with a plain reading of 7 U.S.C. § 499b:

> [§ 499b(4)] restricts those subject to liability to 'commission merchant[s], dealer[s] or broker[s]' and defines these terms in great detail. In contrast, [§ 499b(4)] denotes the protected claimant very generally as 'the person with whom such transaction is had.' [§ 499e(a)], which governs the amount of damages available under an unfair conduct claim, also refers to claimants as 'persons': 'If any commission merchant, dealer, or broker violates any provision of section 499b of this title he shall be liable to the person or persons injured thereby for the full amount of damages ... sustained in consequence of such violation.' 'Person' is defined broadly to include 'individuals, partnerships, corporations and associations.' [Plaintiff], as a corporation, is a 'person.'

*Id.* at 2 (citations omitted).

The *Eastside* Court also held that a broker can pursue an unfair conduct claim under the "full payment promptly" language of § 499b(4):

---

[8] PACA's unfair conduct provision provides, in relevant part:

> It shall be unlawful [...] [f]or any commission merchant, dealer, or broker [...] to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any [perishable agricultural] commodity to the person with whom such transaction is had [....]

7 U.S.C. § 499b.

**18**

> Moreover, as a broker, plaintiff may pursue an unfair conduct claim in light of the definition of 'full payment promptly.' 'Full payment promptly' is defined in part as '[p]ayment of brokerage earned and other expenses in connection with produce purchased or sold, within 10 days after the day on which the broker's invoice is received by the principal....' There is no question that the unfair conduct provision of PACA permits a broker to sue a principal for failure to remit 'full payment promptly.'

*Id.* (citations omitted).

I.G.'s proposed reading of *Eastside Food Plaza* is flawed for two reasons. First, *Eastside Food Plaza*'s holding was limited to whether an unpaid broker could properly raise an unfair conduct claim under 7 U.S.C. § 499b. *Eastside Food Plaza* never addressed whether an unpaid broker is a PACA beneficiary pursuant to 7 U.S.C. § 499e(c)(2). As it never reached the issue - or even discussed § 499e(c)(2) - it is not helpful to I.G.'s claim in this case. Second, § 499b and § 499e(c)(2) are two different statutory schemes that do not apply to or interrelate to one another. For instance, § 499b(4) prohibits "unfair conduct" by entities in the agricultural commodities business, including the failure to maintain a statutory trust. It is an independent cause of action. Conversely, § 499e(c)(2) creates a statutory trust in favor of unpaid sellers, defines eligible parties, and preserves the trust res. *Eastside Food Plaza* is factually distinguishable.

### D. Conclusion

Courts have held that § 499e(c)(2)'s words "in connection with" encompass not only the price of produce but also related attorneys' fees and interest. *See Country Best*, 361 F.3d at 632; *Middle Mountain*, 307 F.3d at 1223. However, those are different

19

cases. Here, I.G. did not sell, supply, or broker the sale of produce to Z & S. Rather, it brokered a number of produce transactions between Z & S and grocery outlets, parties not intended beneficiaries of § 499e(c)(2). I.G. is also not a PACA trust beneficiary as it is not a "supplier, seller, or agent" and it does not seek to recover administrative expenses in addition to unpaid charges for the produce itself.

Allowing I.G.'s claim also opens the door to other creditors asserting similar claims and subverts Congress's intent to protect sellers as the exclusive beneficiaries of the PACA trust. Including invoice language stating that "all items are sold subject to PACA," does not conclusively demonstrate PACA beneficiary status. I.G. is not one of the classes intended to be protected by the PACA Trust. I.G.'s motion is DENIED.

## IV. CONCLUSION

For the reasons stated:

(1) Intervening Plaintiff I.G. Fruit, Inc.'s Motion To Determine Validity of and Objections to Proofs of Claim is DENIED.

Defendant Z & S shall submit a form of order consistent with, and within five (5) days following electronic service of, this memorandum decision.

IT IS SO ORDERED.

**Dated:   June 25, 2010**          /s/ **Oliver W. Wanger**
                                    UNITED STATES DISTRICT JUDGE

20