1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

10 | ONIONS ETC., INC., et al.,                    CASE NO.    1:09-CV-00906-AWI-MJS

11
                                                 MEMORANDUM DECISION AND ORDER
12 |              Plaintiff(s),                   GRANTING MOTION FOR SUMMARY
                                                 JUDGMENT BY INTERVENOR
13 |       v.                                     DEFENDANT FRESNO-MADERA
                                                 FEDERAL LAND BANK ASSOCIATION,
14 |                                              FLCA
   | Z&S FRESH, INC., et al.,
15 |                                              (ECF NO. 778)

16 |              Defendant(s),

17
   | _____
18
   | AND ALL RELATED CROSS-ACTIONS.
19 | _____/

20

21
   | I.    **INTRODUCTION**
22
23 |       Litigation in this case arose out of the financial collapse of Defendant  Z&S Fresh,

24 | Inc., doing business as Z&S Distributing Company, Inc., a California corporation ("Z&S").

25 | (Compl., ECF No. 1.) Multiple claims and cross-actions have been filed against and

26 | amongst the various Defendants and related parties by a number of creditors. Included

27

among those are the still-pending claims by the Fresno-Madera Federal Land Bank Association, FCLA[1] ("Land Bank"), against Aron Margosian[2] and Carrie Margosian ("Margosians") as alleged guarantors of certain debt owed to Land Bank by ZM Fresh Special T's, Inc., a California corporation formerly known as ZMC Fresh Inc., a California corporation (both, "ZM").[3] ZM had been formed by Aron Margosian and Martin Zaninovich, the principal of Z&S. The Margosians have counter-claimed against the Land Bank seeking damages for misrepresentation and related claims arising out of the execution of their guaranty.[4]

The Land Bank consented to the jurisdiction of the Magistrate Judge on September 30, 2011 (Consent of Land Bank, ECF No. 746); the Margosians jointly consented to the jurisdiction of the Magistrate Judge on October 3, 2011. (Consent of Margosians, ECF No. 747.) The District Court Judge referred the claims between Land Bank and the Margosians to the undersigned for all purposes based upon the parties' consent to Magistrate Judge jurisdiction. (Correctional Order, ECF No. 826.)

On January 17, 2012, Land Bank filed this motion for summary judgment or in the alternative summary adjudication of its claims against the Margosians and the counter-claims and defenses of the Margosians. (Mot. for Summ. J. ("MSJ"), ECF Nos. 778-785.) The Margosians filed an opposition to the motion for summary judgment and evidentiary

---

[1] A corporation existing and operating under the Farm Credit Act of 1971, as amended. (See Land Bank's 2nd Am. Cross-Compl., ECF No. 432 at 3.)

[2] At times referred to as Aaron Margosian.

[3] See Land Bank's 2nd Am. Cross-Compl., ECF No. 432 at 3.

[4] See Margosians' 1st Am. Answer and Countercl. to Land Bank's 2nd Am. Cross-Compl., ECF No. 675.

objections.[5] (Opp'n., ECF Nos. 791-797.) The Land Bank filed a reply and objections to evidence.[6] (Reply, ECF Nos. 798-800.) The matter was submitted to the undersigned for decision after extended oral argument February 17, 2012.

For the reasons set out below, the Court grants Land Bank's motion for summary judgment in full.

## II.   **RELEVANT FACTS**

Z&S's principal, Martin Zaninovich, and Cross-Defendant Aron Margosian created ZM, a business operating a fruit packing shed. As of mid-2008, ZM was indebted to Land Bank on a $3.9 million term loan ("Term Loan") secured by a first deed of trust on the ZM packing shed and to Fresno-Madera Production Credit Association ("PCA") on a one-year $1 million operational revolving line of credit loan ("RLOC Loan") secured by a first lien on personal property. (Undisputed Facts, ("UFs") 1-3, 5-6.) Z&S, Zaniniovich, and both Margosians were shown as individual guarantors of both loans. (UFs 2, 4, 7-8.) In late 2008, following statutory[7] notice from Land Bank and PCA that the Loans were "distressed" and suitable for "restructure", ZM, Martin Zaninovich and the Margosians applied for and were provided a restructuring of the two loans into a single 15-year $4,810,000 term Land Bank loan ("Restructure Loan") secured by a first deed of trust on the ZM packing shed and, at least on the face of things, guarantied by Z&S, Zaninovich and the Margosians.

---

[5] Margosians' Objections to the Declaration of Rob Frudden and James Hackler (Margosians Obj., ECF No. 793) are sustained as to the Declaration of James Hackler, ¶ 12 (Fed. R. Civ. P. 56(c)(4)) but otherwise overruled.

[6] Land Bank's Objection to Carrie Margosian Deposition Testimony (Land Bank Obj., ECF No. 800) is sustained pursuant to the parol evidence rule as provided in Section IV. C. hereunder.

[7] 12 U.S.C. § 2202a.

1
2
3
4
5
6

(UFs 14-21.) The Restructure Loan fell into default in July 2009. (UF 36.) There remained $3,404,528.04 unpaid on the Restructure Loan as of January 13, 2012.[8] (UF 37.)  Land Bank seeks to recover that sum from the Margosians. It claims here that there is no dispute as to any material fact relevant to its claims or claims against it by the Margosians and it is entitled to judgment against them for the full unpaid balance of the Restructure Loan.

7
8
9
10
11
12
13
14
15

The Margosians claim that in soliciting and securing their purported signatures on the Restructure Loan General Continuing Guaranty ("Guaranty"), the Land Bank concealed material facts about the financial plight of the borrower, ZM, and the other guarantors, Z&S and Zaninovich, and misrepresented the nature, content and effect of the Restructure Loan documents the Margosians were being asked to sign, (UFs 38-39; Margosians Resp. to UF ("RUF") 39;  Margosian Disputed Facts ("MDFs) 10, 14, 20-21) and as such is liable to the Margosians for general, special and punitive damages for fraud, misrepresentation, and breach of the implied covenant of good faith and fair dealing.[9]

16
17
18
19
20
21

The Land Bank responds to the latter claims by maintaining that undisputed facts show it disclosed to the Margosians all it had a duty to disclose, that the Margosians' claims as to oral misrepresentation by the Land Bank at the time of signing the Restructure Loan Guaranty are barred by the parol evidence rule, and that claims for punitive damages are not recoverable against a federally chartered instrumentality such as the Land Bank.

22

**III.   APPLICABLE LAW**

23
24

Rule 56 of the Federal Rules of Civil Procedure states as to a party who has moved

25

[8] Exclusive of Land Bank attorneys' fees. Margosians' purported objection to UF 37 is overruled.

26
27

[9] See n.4; the Margosians' breach of good faith and fair dealing claim is based upon the same facts alleged in support of their fraudulent concealment and misrepresentation claims. (UF 65.)

for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. Id. at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. Id. at 324. Under this standard, the existence of a mere scintilla of evidence in support of the opposition's position is insufficient to withstand the summary judgment motion. Anderson, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude

-5-

the granting of the summary judgment motion. <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 365 (4th Cir. 1985), overruled on other grounds at 490 U.S. 228 (1989).

The parties bear the burden of supporting their motions and oppositions with the papers they wish the court to consider and/or by specifically referencing any other portions of the record they wish the Court to consider. <u>Carmen v. San Francisco Unified School Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001). The court will not undertake to mine the record for triable issues of fact. <u>Id.</u>

## IV.   **ANALYSIS**

### A.   **The Restructure Loan and Guaranty**

As noted, the Land Bank proceeds against the Margosians based upon the latter's execution of documents which on their face make them liable as guarantors for the unpaid Restructure Loan of ZM. The undisputed facts create a prima facie case of liability on the part of the Margosians.

In November or December 2008[10], ZM entered into the Restructure Loan agreements under which Land Bank agreed to loan $4,810,000 to ZM to pay off the Land Bank Term Loan and the PCA RLOC Loan. (UFs 21, 25, 33-34.) The Restructure Loan Agreement provided that all indebtedness thereunder was to be unconditionally and continuously guarantied by Z&S, Martin Zaninovich, the Margosians.[11] (UF 26; Hackler Decl., Exs. 8-9.)  Aron Margosian signed the Restructure Loan as Treasurer and Chief

_____

[10] The date is in dispute. The dispute as to the date does not create a genuine issue material to the fact of the Margosians' signing of the subject Restructure Loan documents.

[11] The Margosians dispute this fact and others discussed in this section, but except where otherwise indicated, the Court finds that the disputes merely reflect arguments going to the Margosians' claims and defenses in this case, but do not challenge or detract from the truthfulness of the facts asserted or create a genuine issue material thereto.

Financial Officer of ZM. (UF 27.) Aron and Carrie Margosian each signed the Guaranty thereby personally guarantying repayment of the $4,810,00 Restructure Loan. (UFs 29, 43.) In July 2009, the Restructure Loan fell into default. (UF 36.) As noted above, the sum of $3,404,528.04 remains unpaid and past due under the Guaranty. (UF 37.)

Absent the Margosians' counter-claims and affirmative defenses relating to the facts, circumstances and representations leading to their signing the Guaranty, there would be no question as to their liability as guarantors, and Land Bank would be entitled to judgment against them for the full balance due under the Guaranty.[12] The Margosian claims and defenses are analyzed below.

## B.    Alleged Concealment

In May 2008, the Land Bank did an analysis of the credit status of ZM ("Credit Analysis Report") in which its officer concluded that: 1) ZM had used its operating line of credit to pay for capital expenditures; 2) Land Bank's loans to ZM did not meet applicable underwriting standards; 3) Z&S provided the major source of income relied upon by the Land Bank in making its loans to ZM; 4) ZM relied upon Z&S to finance its operations, pay its bills and make its loan payments because ZM could not; 5) ZM was financially draining Z&S; and, 6) Z&S was not creditworthy. (MDF 10.) The Credit Analysis Report also reflected the Bank officer's opinion that if the Land Bank did not restructure the Loan thonly

---

[12] See Cal. Civ. Code § 2806; Rest. 3d, Suretyship and Guaranty § 32 et seq. See also Cal. Civ. Code § 2837 ("In interpreting the terms of a contract of suretyship, the same rules are to be observed as in the case of other contracts . . . .").

other option would be to "call" the loan and doing so could potentially bankrupt one or more of the involved entities.[13] (MDF 11.)

Land Bank did not disclose the Credit Analysis Report to the Margosians. (MDFs 14, 20.)

The Margosians argue that under Sumitomo Bank of California v. Iwasaki, 70 Cal. 2d. 81 (1968), the Land Bank had a duty to disclose to them all information it had regarding the poor financial condition of Z&S, ZM and Zaninovich before the Margosians signed the 2008 Guaranty.

In Sumitomo the California Supreme Court, noting the general duty of good faith and fair dealing owed by a creditor to a guarantor (at times referred to herein as "surety"), adopted a rule that, in addition to the limited duty of disclosure owed by a creditor at inception of a credit suretyship[14] and in the case of a revocable continuing guaranty:[15] Upon every new extension of credit to the borrower the creditor has a duty to disclose to the guarantor facts known by the creditor which the creditor has reason to believe are unknown to the guarantor and which the creditor had reason to believe materially increase

---

[13] This entry in the report is somewhat incongruously followed by a comment about the debtor's attribution of its problems to a previous account officer's approval of actions the Land Bank later criticized. This could imply an alternative motive for the Land Bank's action, but not necessarily an improper one.

[14] Rest. 3d. Suretyship and Guaranty § 12(3):

> If, before the secondary obligation becomes binding, the obligee (creditor) (1) knows facts unknown to the secondary obligor (surety) that materially increase the risk beyond that which the obligee has reason to believe the secondary obligor intends to assume, (2) has reason to believe that these facts are unknown to the secondary obligor, and (3) has a reasonable opportunity to communicate them to the secondary obligor, "the obligee's nondisclosure of these facts to a secondary obligor constitutes a material misrepresentation."

[15] A continuing guaranty is a guaranty relating to future liability of the borrower, under successive transactions, which either continue his liability or from time to time renew it after it has been satisfied. Cal. Civ. Code § 2814.

the risk beyond that which the guarantor intended to assume.[16]  Sumitomo, 70 Cal.2d at 85, 90-93.

The reasoning of this rule is that each such extension of credit creates a new suretyship contract: i.e., a revocable continuing guaranty is a continuing offer that the creditor accepts each time he or she extends credit to the debtor. Id. at 93. The Sumitomo Court noted that the duty to disclose can be greater where the creditor and surety have had a prior course of dealing and the creditor knows the surety is relying on it to deal honestly. Id. at 95.

Land Bank acknowledges the obligation imposed by Sumitomo, but argues that it is inapplicable here because: 1) the Restructure Loan simply represented a restructure and consolidation of existing debt for which the Margosians already were liable as unconditional continuing guarantors and no new extension of credit was made in connection therewith;[17] 2) Land Bank reasonably believed the facts known to it were also known to the Margosians; and 3) Land Bank had no reason to believe the facts materially increased the surety risk beyond that which the Margosians intended to assume.

1.    New or Further Extension of Credit?

As to the first point, it is clear that the Restructure Loan was intended to, and did effect a statutory "restructure" of ZM's then-existing $3.9 million Term Loan and $1 million RLOC Loan into a single $4,810,000 Restructure Loan.[18] (UFs 21, 25.)

---

[16] See also Restatement (First) of Security, § 124.

[17] One continues to wonder why Land Bank deemed it necessary to obtain new guaranties on an already fully guarantied loan.

[18] "The terms 'restructure' and 'restructuring' include rescheduling, reamortization, renewal, deferral of principal or interest, monetary concessions, and the taking of any other action to modify the

Land Bank argues that not only was no new money extended: 1) the total amount of debt exposure represented by the Restructure Loan was less than the combined amount of the prior Term and RLOC Loans; 2) the entirety of the Restructure Loan was secured by the ZM packing facility (whereas the RLOC Loan had not been so secured); and, 3) since the Margosians were guarantors of the prior Loans,[19] they were actually better off under the more favorable terms of the Restructure Loan. According to Land Bank, "the Margosians' exposure went from $4.9M, with only $3.9M secured by the property. . . , to . . . $4,810,00 **all** now secured by the real property." (UFs 30, 33-35.)  Land Bank also refers the Court to its identification of the Restructure Loan as a "straight restructure" not involving any "new funds or credit extended."[20] (UF 28.)

The Margosians assert that the Restructure Loan was a new loan, secured by new guaranties and additional security, and that the repayment term of the restructured RLOC principal was extended from the original one year to fifteen years, constituting a detriment to the Margosians and thus a further extension of credit. Additionally, they claim that the face amount on the new loan actually exceeded what was owed on the two existing Loans.[21]  (RUF 28.) Finally they deny liability for the pre-restructure RLOC balance of $1

---

terms of, or forbear on, a loan in any way that will make it probable that the operations of the borrower will become financially viable." 12 U.S.C. § 2202a(a)(7).

[19] Carrie Margosian denies that she ever signed the guaranty of the earlier Loans. (RUFs 4, 8.)

[20] Land Bank's characterization of the loan, although enlightening as to Bank's intent and understanding, is not determinative of the issue.

[21] The Margosians argue that the December 26, 2008, Borrowers' Final Settlement Statement on the new Restructure Loan showed the balance on the two existing loans to have been $4,794.355.05 (about $15, 645 less than the new Restructure Loan). They do not direct the Court to evidence before it to support this argument. On the other hand, the Land Bank points to the December 16, 2008, Restructure Agreement's statement that the amount outstanding was $4,839,553.84. (See Hackler Decl., Ex. 7.)  The Court finds the latter to be established with competent evidence.

million because the Land Bank allowed such funds to be disbursed improperly;[22] and therefore argue the inclusion of that $1 million amount represents an extension of further credit. (MDFs 5-9.)

No party cites to any legal authority enlightening as to the meaning of the phrase "extending further credit" as used in Sumitomo. The Court is unaware of any such authority, certainly none that specifically extends the reasoning of Sumitomo to apply to what transpired here: Land Bank provided the Restructure Loan in the amount required to pay-off in full its un-mature Term Loan and the mature PCA RLOC Loan; the total principal amount of indebtedness did not increase as a result of this restructure; the term of the RLOC debt was extended from one to fifteen years.

Surprisingly, the California Commercial Code does not define the phrase or even specifically define the word "credit". Some guidance is found in California's Credit Services Act of 1984,[23] which, in the consumer credit context, defines "extension of credit" as "the right to defer payment of debt or to incur debt and defer its payment . . . ."[24]

Black's Law Dictionary, 9th Ed., 2009, defines credit as: "one's ability to borrow money," "the faith in one's ability to pay debts," "the time that a seller gives the buyer to make the payment that is due," and "the availability of funds either from a financial institution or under a letter of credit." Black's Law Dictionary defines extension as "the

---

[22] The Margosians initially included a counter-claim against Land Bank for negligence relating to the predecessor loans but elected to delete it. (Statements, ECF Nos. 668, 671.) The Court then approved the Margosians filing of the operative First Amended Answer and Counter-Claim to Land Bank's Second Amended Cross-Complaint (Order, ECF No. 673) without the claims regarding the earlier loans. (1st Am. Answer and Countercl., ECF No. 675.)

[23] Cal. Civ. Code § 1789.10 et seq.

[24] Cal. Civ. Code § 1789.12(d).

continuation of the same contract for a specified period," and "a period of additional time to take an action, make a decision, accept an offer, or complete a task."

Everyday usage provides more insight. According to the Merriam-Webster On-line Dictionary (http://www.merriam-webster.com/dictionary/) in the present context *extend* means "to make available (*extending* credit to customers)," and *extension* is defined as "an increase in length of time;" "*specifically***:** an increase in time allowed under agreement or concession" and "an enlargement in scope or operation."  The Merriam-Webster On-line Dictionary defines *further* as "going or extending beyond" and "additional," and defines *credit* as "an amount or sum placed at a person's disposal by a bank" and "the provision of money, goods, or services with the expectation of future payment." (formatting omitted)

Certainly the Land Bank did give the debtor a new "right to defer payment" at least as to the RLOC portion of the Restructure Loan which was extended from one year to fifteen years. Certainly, the Land Bank's action falls somewhere within the dictionary and ordinary understanding of the terms "extension" and "credit."  Certainly, the Land Bank did "make available" to the debtor something, i.e., the restructure of two predecessor Loans into one new Restructure Loan secured by new continuing guaranties and additional security with at least one material provision differing from what had applied to one of the two predecessor Loans, i.e., the time for repayment on the RLOC Loan. Consistently, California courts have found an extension of time by the creditor to be a "material alteration" of a loan requiring the consent of an initial guarantor. Mortgage Finance Corp. v. Howard, 210 Cal.App.2d 569, 572 (1962); Wise v. Clapper, 257 Cal. App. 2d 770, 774 (1968).

Based upon the foregoing and the unique facts of this case, the Court finds the

Restructure Loan constituted  an "extension of further credit" under Sumitomo at least insofar as to require the Court to determine whether that which Sumitomo required be disclosed was disclosed. If nothing else, the lengthening of the repayment period on the RLOC Loan term from one year to fifteen years had the potential to extend the time within which the guarantors were obligated on the debt and thereby to increase, because of interest, the total amount which the guarantors might be required to repay. There being no authority to the contrary, common usage and the authorities consulted dictate that such a change be found to constitute a further extension of credit.

### 2.   Material Facts Not Reasonably Believed Known by Margosians

When a creditor extends new and further credit to a debtor, it has a duty to disclose to a guarantor of the debt: 1) facts reasonably believed which materially increase the risk beyond that which the guarantor intended to assume 2) if the creditor has reason to believe the facts are unknown to the guarantor and, 3) the creditor has a reasonable opportunity to communicate the facts to the guarantor. Sumitomo, 70 Cal. 2d. at 93 (citing Rest. (1st) of Security, § 124, sub 1). Here, the Court shall determine if the Land Bank was required, in extending further credit to ZM, to disclose material facts to the Margosians as guarantors of the debt.

No one has suggested that anything would have rendered it impossible or even impractical or difficult for Land Bank to have communicated to the Margosians all information it knew regarding the debt the Margosians were to guaranty.

The issue then is whether Land Bank had information which it should have known was unknown to the Margosians and which materially increased the Margosian's risk beyond that which the Margosians had intended to assume. The Margosians answer in the

affirmative and refer to the seven conclusions drawn by the Land Bank as a result of its May 2008 Credit Analysis Report of ZM's credit worthiness (MDF 10) and focus particularly on Land Bank's conclusions regarding ZM's financial dependence on Z&S and Z&S's precarious financial situation. They note the absence of evidence that the Margosians had access to Z&S's or Zaninovich's financial information.[25] (MDFs 1, 14, 21.)

Land Bank counters that before the Margosians signed as guarantors of the Restructure Loan, they were told that the predecessor Loans were "distressed" (UF 14), and that the financial status of ZM and its guarantors including Z&S and Zaninovich was too questionable for the Land Bank to provide any additional principal funds to ZM. (UF 16.) Land Bank also notes that Mr. Margosian was, and acted as, the Chief Financial Officer of ZM. (UFs 23, 27.)

There is no evidence before the Court that the Margosians were made aware of, or the Land Bank reasonably believed the Margosians were aware of, every single item of information held by the Land Bank and every analysis made by the Land Bank regarding the financial condition of the ZM, Z&S and Zaninovich. On the other hand it is clear now, and certainly was reasonably clear to the Land Bank then, that the Margosians knew that things were not at all well at ZM. How does <u>Sumitomo</u> apply in such circumstances?

<u>Sumitomo</u> draws its rule from the First Restatement of Security § 124. Comment (a) to § 124 observes that the rule "is merely a special application in suretyship of the rule of Contracts that fraud creates a defense." Comment (b) to § 124 notes potential difficulty in

---

[25] If a finding needed to, and could be, made here as to what the Margosians knew or did not know, it is difficult to imagine they appreciated the perilous status of Z&S and Zaninivich and still allowed themselves to be subjected to the financial and legal plight in which they now find themselves. However, the issue is not necessarily what they knew, but what the Land Bank had reason to believe they knew or did not know.

-14-

applying the rule, but points out that the rule itself is quite simple; it does not obligate a creditor to investigate for the benefit of the guarantor or to take special steps to find out what the guarantor knows. Recognizing that such suretyship arrangements necessarily involve an assumption of risk by the surety that varies from transaction to transaction, it nevertheless forbids a lender from knowingly allowing a guarantor to act on a mistaken belief as to facts material to the surety's risk such as financial condition of the borrower, "secret agreements" between the parties, or the relations of third parties to the borrower, where the lender has an opportunity to disclose. The test of materiality of the facts is an objective one. Comment (c) to § 124 states that concealment may be a defense to the guarantor where the creditor knows that the borrower is insolvent and knows that the guarantor does not know of that insolvency and yet continues making loans to the borrower without informing the guarantor of the insolvency.

"It is of the essence of the Restatement defense that [the creditor] have reason to know that certain risks were not within the contemplation of the guarantor, and have reason to believe that information possessed by [the creditor] was unknown to the guarantor and that such information concerned activity of the debtor that might materially increase those risks." Bank of Santa Ana v. Molina, 1 Cal.App.3d 607, 622 (1969).

A lender may have a greater burden of disclosure where the guarantors are uncompensated (UF 66) and where there is no evidence they conducted their own investigation of surety risk. See St. Petersburg Bank & Trust Co., v. Boutin, 445 F.2d. 1028, 1034 (5th Cir. 1971) (no discharge of surety where it had conducted its own investigation of the debtor); First Nat. Bank of Arizona v. Bennett Venture, Ltd., 130 Ariz. 562, 564 (Ariz.Ct.App. 1981), (no discharge where the guarantor was in business with the

corporate borrower and was in a better position than the bank to know the borrowers financial situation); cf., International Harvester Co., v. Fuoss, 157 Ariz. 378, 381 (Ariz.Ct.App. 1988) (discharge of surety where the creditor knew of the debtor's financial difficulties and knew that the debtor had divorced defendant surety and remarried another).

It is reasonable to conclude the Land Bank had, and perhaps knew it had, particular items of information and detailed financial analysis reflecting on the individual and consolidated creditworthiness of ZM and co-guarantors Z&S and Zaninovich, including collateral and security valuations, that were different than and perhaps more enlightening than those known to the Margosians. But nothing this Court has found obligated the Land Bank to disclose every single iota of information it possessed. Rather the law required that the Land Bank provide the Margosians with such information believed to be unknown to the Margosians which materially increased their surety risk beyond that which they intended to assume.

In this case, the Margosians were expressly aware that Land Bank had affirmatively denied a further loan request by ZM because the predecessor Loans were distressed and due to concerns about collateral value, cash flow and prospects for repayment. (UFs 14, 16.) The Margosians co-signed an application to restructure the distressed predecessor loans.  That restructure was necessitated by the type, if not the entire quantum, of negative financial information and corresponding increased risk of which they disavow knowledge. (UFs 16-19.) Land Bank had advised the debtor and guarantors that the Restructure Loan would remain "distressed". (UFs 14, 22.)[26] Land Bank knew that Mr. Margosian was the

---

[26] The term "distressed loan" means a loan that the borrower does not have the financial capacity to pay according to its terms and that exhibits one or more of the following characteristics:  (A) The borrower is demonstrating adverse financial and repayment trends; (B) The loan is delinquent or past due

Chief Financial Officer of ZM and in business with Zaninovich and Z&S. (UFs 3, 7, 23, 27.) Although there is no evidence the Margosians had actual knowledge of the extent of Zaninovich's apparent misdealings and the depth of his and Z&S's resulting financial problems, it would have been reasonable for the Land Bank to believe that the Chief Financial Officer of ZM had to be aware of the information in ZM's financial reports and of its financial position, and know how closely dependent ZM was on Z&S and Zaninovich.[27] Having been doing business with the latter two, he certainly was in as good, if not better, a position than Land Bank to investigate and evaluate the risk of the Guaranty. Land Bank also reasonably could believe that Mr. Margosian would communicate the same to his co-guarantor wife. Indeed, under such circumstances, one might consider it unrealistic, if not unreasonable, for the Land Bank to have thought otherwise.

This Court concludes that under all the circumstances surrounding the Restructure Loan and these relationships, the law did not impose on Land Bank responsibility to disclose to the Margosians any more than it did disclose. The Margosians have not identified a particular mistaken belief on their part of which the Land Bank was or should have been aware. The guarantor risks implicit in the predecessor Loans being distressed, new loans being declined, and the terms and conditions of the Restructure Loan are co-extensive with the risks implicit in the May 2008 Credit Analysis Report.

Land Bank has met its burden on moving for summary judgment on this issue by

---

under the terms of the loan contract; (C) One or both of the factors listed in subparagraphs (A) and (B), together with inadequate collateralization, presenting a high probability of loss to the lender. 12 U.S.C. § 2202a(a)(3).

[27] Mr. Margosian asserts he was a mere figurehead and unaware of ZM's finances. (MDF 21.) Even if so, he was holding himself out to the public and to Land Bank as, and signing loan documents as, the CFO. He, not Land Bank, should bear the consequences if that characterization was more form than substance.

putting forth evidence that it made the Margosains well aware of financial difficulties of ZM and the co-guarantors on the predecessor Loans, reflected these difficulties in the terms and conditions of the Restructure Loan applied for and accepted by the Margosians, and did not knowingly allow the Margosians act on a mistaken belief of the risk attendant to guarantying the Restructure Loan. In response, the Margosians have not identified any material information which Land Bank had reason to believe was unknown to the Margosians relating to the risk of guarantying the Restructure Loan. For the reasons stated, the mere fact Land Bank did not disclose its May 2008 Credit Analysis Report is not sufficient to raise a genuine issue of material fact in this regard.[28]

The Margosians have presented evidence, indeed quite disconcerting evidence, that Land Bank may have been less than forthright regarding the circumstances of its representatives' visit to the Margosian home, the manner in which they presented the Restructure Loan documents to the Margosians, and their representations about the purpose and effect of the documents being signed. (UFs 21, 25, 44-51, 55; MDFs 13-21.) In particular, Carrie Margosian testified that on the day she signed the loan documents, the Land Bank's representative, Ms. Hugger, called without advance notice, stating she was "in the area" and that she and an associate, Mr. Frudden (a Land Bank Vice President/Senior Loan Officer whom she introduced as an employee "in training") wanted to stop by to have the Margosians sign some documents changing the name of ZM from ZMC to ZM Fresh. (MDF 14.)  At the Margosians' home, Ms. Hugger represented the papers they were signing were just formalities needed to put the new name on the loan.

---

[28] See n.5 as overruling, inter alia, Margosians' Evidentiary Objection to UF 58.

Strangely, Mrs. Margosian asked what would happen if the packing house did not do well. According to Mrs. Margosian, the Bank representatives showed her Zaninovich's signature on a guaranty document and represented to her and her husband that Zaninovich and Z&S were guarantors and that no documents obligated the Margosians or their assets personally on the Restructure Loan; only the ZM packing house was at risk—it guarantied itself. (MDF 14.) In reality the Restructure Loan documents said the opposite. (UF 63.) According to a later Land Bank memo, Ms. Margosian was "a little overwhelmed" during this visit and the Bank representative did an outstanding job making her comfortable and getting her to sign. (MDFs 16-17.)

Land Bank disputes temporal aspects of the Margosians' version of this visit (UFs 44- 55)and refers to circumstantial evidence suggesting the Margosians' characterization of events is fictional. Thus, at least to this limited extent we have a factual dispute. The Court concludes that the dispute does not pertain to a fact material under Sumitomo. These claims and the evidence supporting them create a dispute as to whether the Land Bank acted deviously and perhaps dishonestly in its efforts to get these documents signed. It may be that Land Bank had ulterior, purely selfish motives for doing so.  Nevertheless neither this nor any other evidence submitted would enable the Court to conclude that Land Bank knowingly allowed the Margosians act on a mistaken belief of the risk attendant to guarantying the Restructure Loan.

For all these reasons, the Court finds that there is no genuine dispute as to any fact material to the issue of whether Land Bank fulfilled its disclosure duty under Sumitomo. The undisputed facts satisfy this Court that Land Bank did discharge its obligations of

disclosure and that the Margosians have not raised a valid counter-claim or defense to

enforcement of their Guaranty obligations based on an alleged failure of Land Bank in this

regard.

### C.    Parol Evidence

The Margosians also claim that, regardless of what they knew or were told about

the financial status of ZM and the other Restructure Loan guarantors, the Land Bank

affirmatively and fraudulently misrepresented to the Margosians what they were signing in

late 2008 and affirmatively misrepresented that the Restructure Loan was guarantied by

the income, assets, and lien on the ZM packing shed such that the Margosians had no

personal liability. (UF 38.) The Land Bank offers circumstantial evidence suggesting these

claims are fictional (UFs 44-55) and also notes that the Guaranty is a fully integrated

agreement which states explicitly that the Margosains' personal assets are not exempt

from the reach of the Guaranty. (UFs 24-29, 43, 60-63.) Land Bank argues that since the

Margosian claims of misrepresentation directly contradict the terms of the integrated written

agreement, those claims and the defenses based thereon are barred as a matter of law

by the parol evidence rule set forth in California Civil Code § 1625 and California Civil

Procedure Code § 1856. Land Bank objects to portions of the Carrie Margosian Deposition

to the extent the testimony references statements or representations that conflict with the

terms of the integrated written agreements.[29]

California Civil Code § 1625 says, simply, "The execution of a contract in writing .

. . supercedes all the negotiations or stipulations concerning its matter which preceded or

---

[29] Obj. of Land Bank, ECF No. 800.

accompanied the execution of the instrument." California Civil Procedure Code §1856(a) states: "Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement."  In short, according to Land Bank, the Margosians' reliance on alleged misrepresentations by Land Bank regarding what they signed is inadmissable because the executed, integrated documents provide to the contrary.

The parol evidence rule as codified generally prohibits the introduction of either oral or written extrinsic evidence to vary, alter, or add to the terms of an integrated written agreement. In re Gaines' Estate, 15 Cal.2d 255, 264-265 (1940); Duncan v. McCaffrey Group, Inc., 200 Cal.App.4th 346, 363 (2011) (citing Casa Herrera, Inc. v. Beydoun 32 Cal.4th 336, 343 (2004). The issue of whether the parol evidence rule applies to exclude a collateral agreement is one of law to be determined by the court. Banco Do Brasil, S.A. v. Latian, Inc. 234 Cal.App.3d 973, 1001 (1991).

The Land Bank cites to a long line of cases rejecting claims by obligors that they were told they were signing something other than what they signed. The seminal case is Bank of America v. Pendergrass 4 Cal. 2d. 258 (1935) in which the California Supreme Court rejected parol evidence of a creditor's alleged promise that the debtor would not have to repay a loan for at least a year where the written loan agreement made the note payable "on demand". The Court held that to allow parol evidence of a promise directly at variance with the promise of the written agreement would "open the door to all evils that the parole evidence rule was designed to prevent."  Id. at 264.

California appellate courts applying Pendergrass have consistently excluded

evidence that the party seeking to enforce a contract made promises inconsistent with the contract. See Duncan, 200 Cal.App.4th at 376-77 (citing to Bank of America v. Lamb Finance Co.  179 Cal.App.2d 498, 503 (1960)) (excluding evidence bank promised defendant it would not have any personal liability on a note where the note itself provided otherwise); Banco Do Brasil, S.A., 234 Cal.App.3d at 973 (excluding evidence defendant was promised an extension of a line of credit as an inducement to sign a personal guaranty where the instrument stated the defendant's obligations were "unconditional"); Alling v. Universal Manufacturing Corp. 5 Cal.App.4th 1412, 1434-36 (1992) (excluding evidence business purchaser promised to comply with terms of seller's business plan where the sales contract granted sole discretion in that regard to the buyer); Wang v. Massey Chevrolet 97 Cal.App.4th 856, 876 (2002) (excluding representation that contract could be terminated early without penalty).

Nevertheless, both parties also acknowledge the existence of the "fraud exception" to the parol evidence rule: Subsection (f) of California Civil Procedure Code § 1856 provides that "[w]here the validity of the agreement is the fact in dispute, this section [1856] does not exclude evidence relevant to that issue." Subsection (g) then adds, as pertinent here, that § 1856 "does not exclude other evidence of the circumstances under which the agreement was made . . . or to establish . . . fraud."

The Pendergrass court noted that to be admissible, the parol evidence of fraud "must tend to establish some independent fact or representation, some fraud in the procurement of the instrument." Accordingly, the fraud exception has been held to be unavailing unless the false promise is independent of or consistent with the written instrument, i.e., the exception does not apply where parol evidence is offered to show a

fraudulent promise directly at variance with the terms of the written agreement. Banco Do Brasil, S.A., 234 Cal.App.3d at 1009.

Courts have applied the fraud exception to allow parol evidence where the alleged fraud would void the contract and leave it devoid of legal effect. Thus, in Fleury v. Ramacciotti, 8 Cal. 2d. 660 (1937), the court allowed parol evidence to support setting aside a default deficiency judgment where defendant claimed that his intimate friend, plaintiff, had persuaded him to renew a time-barred secured note by promising that it would be enforced only against the security and not him personally. Acknowledging the parol evidence rule, the court noted nevertheless that "fraud may always be shown to defeat the effect of an agreement."  The Fleury court reiterated its earlier holding in California Trust Co., v. Cohn, 214 Cal. 619 (1932), that "where failure to read an instrument is induced by fraud of the other party, the fraud is a defense even in the absence of fiduciary or confidential relations."  Fleury, 8 Cal.2d at 662.

Similarly, legally blind and illiterate purchasers of bank securities who had longstanding relationships with the bank and who reasonably relied on bank's misrepresentations as to what they were signing and did not read before signing were allowed to claim fraud in the execution and void the contract in Rosenthal v. Great Western Fin. Securities Corp., 14 Cal.4th 394, 429 (1996).

In Pacific State Bank v. Greene, 110 Cal.App.4th 375, 392-93 (2003),[30] a  bank made "misrepresentations of fact" as to the content of a contract at the time of execution

---

[30] The California Supreme Court has accepted for review Riverisland Cold Storage, Inc., v. Fresno-Madera Production Credit Association,191 Cal.App.4th 611 (2011), a case relying on Greene to admit parol evidence of a party's misrepresentation of the contents of a written agreement. The grant of review may foreshadow a reappraisal of the holding in Greene.

by telling the guarantor its guaranty applied only to one loan even though the document extended the indebtedness guarantied to all of the debtor's loans. The court allowed parol evidence of the misrepresentation because it found the guarantor's reliance on the misrepresentation reasonable under the circumstances, i.e., the guaranty on its face referenced only one loan and the extension to all debt was hidden in fine print. Id.

As noted at the hearing of this Motion for Summary Judgment, the Court finds it difficult to reconcile Greene with the other authority referenced above. On the other hand, it agrees with Greene that the dividing line between a promise at odds with the terms of the agreement and a misrepresented fact concerning the physical content of the agreement is somewhat less than crystal clear. However, Greene and the other cases allowing parol evidence are quite helpful in emphasizing the importance of the reasonableness of reliance by the defendant in those cases. The Court is unable to find similarly reasonable reliance here. These were not contracts negotiated between friends, intimate or otherwise. They were between a bank and a commercial operation which had borrowed millions of dollars in troubled loans from the bank. Neither guarantor was blind. There is no evidence either was illiterate or otherwise impaired in ability to read, write, or communicate English.

The Margosians propose to submit evidence they were tricked and deceived by the Land Bank and had no idea that they were signing an unconditional personal guaranty. They claim the Land Bank continues to misrepresent when, why and how the documents were signed. In this regard, the Land Bank presents evidence that all of the 2008 loan documents at issue in this dispute were generated on December 16, 2008, and signed by the Margosians on December 18 and 19, 2008. (UFs 44, 46, 50, 52, 53.) Anticipating Margosians' claims to the contrary, the Land Bank asserts multiple additional facts which

1
2
3
4
5
6
7
8
9
10
11
12
13
14

it feels corroborate the above and refute the Margosians' challenge to the events described. (See, e.g., UFs 45-51.) The Margosians then cite to a series of facts which they contend create disputes as to these assertedly undisputed Land Bank facts. For example, they allege one of the Restructure Loan documents, the deed of trust, was dated November 17, 2008 (MDF 18), that they signed the documents in October or November 2008, but definitely before November 18, 2008 (MDF 13), that Land Bank's representative testified the documents were signed before December 15, 2008 (RUF 50), and that the document signed on December 19, was simply a name change on a grant deed (RUF 55; MDF 19.). Such disputes, in and of themselves, are not material because they do not detract from the very basic, and effectively undisputed, fact that the Margosians did sign the Guaranty (UF 43) and that Guaranty on its face obligated the Margosians personally and unconditionally on the debt.

15
16
17
18
19
20
21
22
23
24
25
26
27

Unreasonable reliance upon a misrepresentation, in light of the relying party's own intelligence and information, cannot support a fraud claim. Dias v. Nationwide Life Ins. Co., 700 F.Supp.2d 1204, 1215 (E.D. Cal. 2010). "The particular circumstances of the contract's execution, including the prominent and discernible provisions of the contents of the writing in issue, must make it reasonable for the party claiming fraud to have nonetheless relied on the mischaracterization. This is not an easily met burden of proof . . . ." Greene, 110 Cal.App.4th at 393. The unconditional nature of the Margosians' Guaranty is readily apparent in the first sentence of page one of the Guaranty and is entirely consistent with the Margosians' prior course of conduct in agreeing to the obligations on their Term and RLOC Loan guaranties (UFs 1-2) and with the Restructure Application they signed. (UFs 17-19.).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

The Margosians' claimed reliance on Land Bank representations contrary to the express terms of their Guaranty, Restructure Application, and predecessor Loan practice was not reasonable. The Margosians knew they were signing documents relating to a loan on the ZM packing house, that the papers had to do with restructuring similar loans and related documents they had signed in 2007 (which also included a continuing personal guaranty showing the Margosians' signatures), and that there was a document relating to a guaranty. At least Mrs. Margosian expressed concern about personal liability. Though they claim they were told before and at the time of signing that they had no personal liability, the documents they signed provide directly the opposite and explicitly make each of the Margosians personally liable. There is no evidence that they were told they had to sign the documents then and there or that they were denied, or would have been denied, the opportunity to read them. Although the facts relating to the signing of similar documents having essentially the same effect in 2007 are similarly disputed, the evidence reflects that the Margosians both had done precisely that. (UFs 1-2, 7.) Before signing in 2008, they had opportunity to review the earlier documents, to inquire into their effect and similarly to inquire as to the restructure being negotiated pursuant to their own application. (UFs 17-20, 22.) A party's misrepresentation as to the nature or contents of a contract does not negate the other party's assent to it where the latter had a reasonable opportunity to know of the essential terms of the contact. Rosenthal, 14 Cal.4th at 423; see also Rest.2d Contracts, § 163, p. 443 ("If a party, with such reasonable opportunity, fails to learn the nature of the document he or she signs, such 'negligence' precludes a finding the contract is void for fraud in the execution."). Regardless of what the Bank representatives may have said about the content and effect of the Guaranty, the Margosians could have investigated and

determined its true purpose and effect.

There is, as noted, an inexplicable and unresolved conflict as to what was said by Land Bank representatives in connection with signing. The Margosians do challenge the Land Bank's characterization of the circumstances in which the Restructure Loan documents were presented to them and what they were told about the documents they were being asked to sign. The Court is not satisfied the whole story ha yet been told. However the Court is unable to identify anything in the Margosians' proffer that would enable a finding that the Margosians' could have or did reasonably rely on any misrepresentation they attribute to Land Bank. Their claims of Land Bank fraud and misrepresentation are inadmissable under the parol evidence rule as particularly espoused in Pendergrass and its progeny. The Objection of Land Bank (ECF No. 800) to cited portions of the Carrie Margosian Deposition Testimony is sustained.

"The Pendergrass rule has been criticized by some scholars because it prevents some actions based on a theory of promissory fraud. It is more properly characterized, however, as a rational policy choice that has never been reconsidered by the [California] Supreme Court." Duncan, 200 Cal.App.4th at 369 (citing Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 485 (1989)).  Pendergrass has never been overruled. It is the law. This Court has followed and applied the rule established thereby.  Dias, 700 F.Supp.2d at 1216. Pendergrass precludes the Margosians from introducing parol evidence of a promise directly at variance with the promise in the written agreement, i.e., evidence that they were told they would not be personally liable when the written Guaranty explicitly states that each is indeed personally liable.

D.    **Punitive Damages**

The rulings herein above render moot the issue of whether the Margosians may seek recovery of punitive damages against the Land Bank.  However the issue is properly before the Court and will be addressed.

Margosians' cross-action seeks damages, including punitive damages, against the Land Bank. The Land Bank argues that it may not be held liable for punitive damages. It cites to the provision in the Federal Tort Claims Act, 28 U.S.C. 2674, to the effect that neither the United States nor any of its departments or agencies may be held liable for punitive damages. 28 U.S.C. 2671 defines "federal agency" to include corporations acting as instruments of the United States. The Land Bank asserts that it is a federally chartered corporation and an instrumentality of the United States.[31]

The Margosians acknowledged at the hearing on this Motion for Summary Judgment that the evidence then on file was sufficient to hold that the Land Bank was in fact a "federally chartered institution" which, at least on the face of things, protects it from punitive damage claims.  See Matter of Sparkman, 703 F.2d. 1097 (9th Cir. 1983); Woodland Production Credit Assn., v. Nicholas, 201 Cal.App.3d 123 (1998). However, the Margosians refer the Court to the very strong, and quite logical, criticism of the rule and such holdings. The criticism derives from the evolution of federally chartered land banks into something virtually identical to commercial lenders no longer having much, if anything, in common with federal agencies or any justification for continued statutory protection from punitive damage claims. See e.g., In Re Hoag Ranches, 846 F.2d. 1225 (9th Cir. 1988); McGee v Tucoemus Federal Credit Union, 153 Cal.App.4th 1351 (2007).

---

[31] Hackler Supp. Decl., Ex. 1.

Regardless of one's views of the policy behind the statutory prohibition against punitive damages, the law establishing it has not been repealed nor found to be unenforceable. Federal Credit System institutions such as the Land Bank and the PCA are, upon issuance of a charter under the Farm Credit Act, federally chartered bodies corporate and instrumentalities of the United States.[32] See e.g., Federal Reserve Bank v. Metrocentre Improvement Dist. # 1, 657 F.2d 183, 186 (8th Cir. 1981).

The cited Sparkman case has never been overruled. This Court is bound to follow Sparkman and the Farm Credit Act and related statutes. The Margosians' punitive damage claim against Land Bank could not proceed even if a viable cause of action had survived this Motion for Summary Judgment.

## V.   CONCLUSIONS AND ORDER

The facts put forward by Land Bank and established by competent evidence establish that Land Bank met all of its disclosure obligations under Sumitomo, that the Margosians' claims of fraud and misrepresentation are barred by the parol evidence rule, and that a punitive damages claim against Land Bank may not in any event proceed. The Margosians have not shown any fact material thereto to be in genuine dispute.

Accordingly, Land Bank is entitled to summary judgment on its Second Amended Cross-Complaint, Count II  (ECF No. 432), and against the Margosians as to all Counter-Claims and Affirmative Defenses on their First Amended Answer and Counter-Claim to Fresno-Madera Federal Land Bank's Second Amended Cross-Complaint. (ECF No. 675.)

Based upon the foregoing, it is HEREBY ORDERED that Land Bank's Motion for

---

[32] 12 U.S.C. §§ 2091, 2211.

Summary Judgment, filed January 17, 2012 (ECF No. 778) on Count II of its Second Amended Cross-Complaint (ECF No. 432) and on the Margosians' First Amended Answer and Counter-Claim to Land Bank's Second Amended Cross-Complaint and all counter-claims and defenses therein (ECF No. 675) is GRANTED in full.

IT IS SO ORDERED.


Dated:   __July 23, 2012___          _____/s/ *Michael J. Seng*_____

                                     UNITED STATES MAGISTRATE JUDGE